1  **FARIDA BAIG**
   **632 E. Carson St., #2**
2  **Long Beach, CA 90807**
   **(562) 477-1175**
3



4  Plaintiff, in pro per

5

6

7

8

9          **UNITED STATES DISTRICT COURT OF CALIFORNIA**

10     **CENTRAL DISTRICT OF CALIFORNIA, CENTRAL DIVISION**

11  FARIDA BAIG,                        Case No.

                Plaintiff,              **CV15-08963-RGK(ASx)**

12                                      **COMPLAINT FOR**
       v.                              **DECLARATORY RELIEF AND**
13                                     **INJUNCTIVE RELIEF**

14  EDMUND G. BROWN, JR., in his
    official capacity as Governor of
15  California; KAMALA D. HARRIS in
    her official capacity as the Attorney
16  General of the State of California; JAY
    C. RUSSELL, an individual and        
17  Supervising Deputy Attorney General;
    MARTINE NOEL D'AGOSTINO, an
18  individual and Deputy Attorney
    General; and DOES, 1-20, Inclusive.
19

20
                Defendants.
21

22

23

24  Plaintiff, FARIDA BAIG (collectively "Plaintiff") alleges as follows:

                        **THE PARTIES**
25
        1.    Plaintiff is an individual who currently resides in Long Beach,
26
    California, county of Los Angeles.
27
        2.    Defendant EDMUND G. BROWN, JR. is the Governor of the State of
28

                                        1

California ("Governor"). In his official capacity, the Governor is the chief executive officer of the State of California. It is his responsibility to ensure that the laws of the State are properly enforced. The Governor maintains an office in Los Angeles.

3.      Defendant Kamala D. Harris is sued in her official capacity as the Attorney General of the State of California ("Attorney General"). Defendant Harris has supervisory powers over the district attorneys, sheriffs, and other law enforcement officials of the State pursuant to California Constitution, Article V, Section 13, and California Government Code Sections 12524, 12550, and 12560.

4.      Defendant MARTINE NOEL D'AGOSTINO, an individual and Deputy Attorney General is sued as an individual and in her official capacity as Deputy Attorney General.

5.      Defendant JAY C. RUSSELL, an individual and Supervising Deputy Attorney General is sued as an individual and in his official capacity as Supervising Deputy Attorney General.

6.      Each and all Defendants are licensed California attorneys who have an ethical obligation to know the California Constitution and knew or should have known that Plaintiff was entitled to reasonable notice and a right to be heard under Marcy's Law.

7.      The true names and capacities, whether individual, corporate, associate or otherwise of defendants DOES 1 through 20, inclusive, are not known to Plaintiffs, who therefore sue such defendants by such fictitious names. Plaintiff will amend her Complaint to show DOE defendants' true names and capacities when the same have been ascertained.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to the California Constitution, Article VI, Section 10, because this case is a cause not given by statute to other trial courts. Venue is proper in this Court because certain Plaintiff and

1   Defendants reside or are situated in Los Angeles County.

2       9.   Plaintiff is informed and believes, and on the basis of such information
3   and belief, allege that in doing the acts and things hereinafter alleged, each
4   defendant was the agent and employee of each of the other defendants, and in doing
5   the things hereinafter alleged, acted within the course and scope of such agency and
6   employment.

7       10.   Plaintiff is informed and believes, and on the basis of such information
8   and belief allege, that DOE defendants 1 through 20, inclusive, are somehow
9   responsible for the acts and occurrences alleged herein and are responsible for the
10   Plaintiff's damages as alleged in this Complaint.

11   **FACTUAL ALLEGATIONS**

12       11.   On or about February 18, 1980, Rodney Quine, and his co-defendant,
13   were charged with the murder, kidnapping, and robbery of Plaintiff's father, Shahid
14   Ali Baig.  Mr. Quine received a sentence of life in prison without the possibility of
15   parole.

16       12.   In or about August 2002, Plaintiff registered with the State of
17   California, Victim Services Department ("Victim Services"), a department that is
18   within the California Attorney General's office ("Attorney General") to receive
19   notification of proceedings involving Rodney Quine and his co-Defendant.

20       13.   Not once did the Governor's Office acknowledge or identify any rights
21   I had under California Constitution, Article One, Section 28(b) (Marsy's Law)

22       14.   On or about November 4, 2008, the People of the State of California
23   approved Proposition 9, the Victims' Bill of Rights Act of 2008 ("Marsy's Law").
24   Marsy's Law amended the California Constitution to provide additional rights to
25   victims.  Attached hereto as **Exhibit "1"** is a copy of Marsy's Law from the
26   Attorney General's website.  Not

27

28

./.1

15. Not once did the <u>Attorney General's Office</u> acknowledge or identify any rights I had under California Constitution, Article One, Section 28(b) (Marsy's Law)

16. On or about August 10, 2015, Plaintiff was driving and listening to KFI, a talk show radio station, and heard that Rodney Quine was granted an order to receive a sex reassignment surgery, to be paid for by California taxpayers. Plaintiff abruptly slammed on her breaks causing her to suffer emotional distress from hearing the news that the State of California had entered into a settlement agreement with the man who brutally murdered her father. The Plaintiff immediately recognized Rodney Quin's name as she has been monitoring both Mr. Quin and his co-defendant over the years through Victims Services. So much so, that Plaintiff previously requested, from Victim Services, to be notified of any proceedings concerning Mr. Quine or his co-defendant.

17. On or about August 11, 2015, Plaintiff called the Attorney General's office to inquire as to why she was not notified under Marsy's Law and of the status of this case and was told only that there was a settlement agreement and that it was not finalized. When Plaintiff was met with uncooperativeness and impoliteness on a speaker phone, she inquired as to who to serve at the Attorney General's office. Plaintiff was told by Ms. D'Agostina and/or her supervisor that they cannot give Plaintiff that information, as it was considered legal advice. I informed Ms. D'Agostino that I would find the information on the Attorney General's website and her response was, "You do that." Not once during this conversation did either Ms. D'Agostino or her supervisor state any sympathy for the loss of Plaintiff's father.

18. On or about August 12, 2015, Plaintiff called the Governor's office and spoke to a person in his "Corrections" department. I requested a meeting with the Governor or someone who could answer some questions regarding the State's failure to notify Plaintiff under Marsy's Law and the order granting sex reassignment surgery to the man who murdered my father. I was met with

1  abruptness and was told hastily that the only way Plaintiff could request a meeting
2  with the Governor is if she made a request on the Governor's website.  After the
3  phone call, Plainitff logged onto the Governor's website and requested a meeting.
4  To this date, Plaintiff has not received a response.

5       19.   On or about August 13, 2015, Plaintiff sent a letter by mail, e-mail
6  and/or facsimile to Governor Gerald Brown, Kamala Harris at the Attorney
7  General's Office, Ms. D'Agostino at the Attorney General's Office and a copy to
8  Mule Creek State Prison which is where Mr. Quin is housed as an inmate.  A copy
9  of Plaintiff's letter is attached hereto, as **Exhibit "2."**  To date, Plaintiff has not
10 received a response from any one of these agencies.

11      20.   On or about mid-end August 2015, Plaintiff attempted on several
12 occasions to speak to someone at the State level, including the person in the
13 "Correction" department at the Governor's office but was told the person Plaintiff
14 needed to speak to was not in and was transferred to voice mail.  To date, Plaintiff
15 have not received a response.

16                    **FIRST CAUSE OF ACTION**
17                      **(Declaratory Relief)**
18                     **Against All Defendants**

19      21.   Plaintiffs reference and incorporates paragraphs 1-15 as though fully
20 set forth herein.

21      22.   Plaintiff desires a judicial determination of Plaintiff's rights and a
22 declaration as to the enforceability of Paragraphs 7 and 8 under Marsy's Law.  A
23 judicial declaration is necessary and appropriate at this time in order that Plaintiff
24 may ascertain her rights under Marsy's Law.  A copyof Marsy's Law is attached
25 hereto as **Exhibit "1."**

26      The portions relative to notifying victims of **all** and **any** proceedings, is as
27 stated as follows:

28

/ . / 1                          5
COMPLAINT FOR DECLARATORY RELIEF AND INJUNCTIVE RELIEF

"(7) To reasonable notice of **all** public proceedings, including delinquency proceedings, upon request, at which the defendant and the prosecutor are entitled to be present…

(8) To be heard, upon request, at **any** proceeding, including any delinquency proceeding, involving a post-arrest release decision, plea, sentencing, post-conviction release decision, or <u>any proceeding in which a right of the victim is at issue.</u>"

Here, the Attorney General's office has Plaintiff's contact information on file with Victim's Rights Services for the purpose of informing Plaintiff of any and all proceedings but failed to notify Plaintiff of the proceedings that took place in *Rodney James Quine v. Edmund G. Brown, et al.*, Case No. 3:14-cv-02726-JST which was filed in the United States District Court, Northern Division.

The Northern District Court allows that "All Proceedings are open to members of the public…"  Plaintiff is a member of the public and would have attended these proceedings if Plaintiff was properly notified under Marsy's Law. Attached hereto, as **Exhibit "3"** is a printout from the United States District Court, Northern Division's website showing that all proceedings are open to the public.

The docket in the *Quine* case, which can be accessed by the public, shows that several "Proceedings" took place in this case, including Case Management Conferences and a Settlement Conference.  Attached hereto as **Exhibit "4"** is  a copy of the Docket.  Thus, under Marsy's Law, Plaintiff should have been notified of the Proceedings in the *Quine* case.

The Attorney General's Office failed to properly enforce Marsy's Law by failing to notify Plaintiff of the proceedings in the *Quine* case.

The Governor failed to ensure that Mary's Law was properly enforced by the Attorney General's office when the Attorney General's office failed to notify Plaintiff of the proceedings in the *Quine* case.

///

///

COMPLAINT FOR DECLARATORY RELIEF AND INJUNCTIVE RELIEF

## SECOND CAUSE OF ACTION

### (Injunctive Relief)

### Against All Defendants

23.     Plaintiffs reference and incorporate paragraphs 1-15 as though fully set forth herein.

24.     On or about August 7, 2015, 2015, the Attorney General's office and Rodney Quine entered into a Joint Notice of Settlement Agreement ("Settlement Agreement") which provides for Mr. Quine undergo sex reassignment surgery if recommended by one of two doctors in the field. Attached hereto as **Exhibit "5"** is the Joint Notice of Settlement Agreement.  Attached to the Settlement Agreement are reports by two experts by Dr. Randi Ettner and  Dr. Richard Carrol.

25.     On page 18, Paragraph 76 of Dr. Etter's Report, she states, "Her [Quine] inability  to reduce or modulate this internal anguish is **likely** to result in emotional decomposition and further self-harm." In Paragraph 77, on Page 18, Dr. Etter states, "Were Ms. Quine to undergo this surgical procedure, her symptoms would be attenuated and **possibly** eliminated."

26.     On Page 3, Paragraph 9 of Dr. Carroll's Report, he states, "…sex-reassignment surgery is **likely** to significantly reduce Ms. Quine's other mental-health conditions, which include depression, anxiety, and risk of suicide attempts."

27.     The words "likely" and "possibly" are indications that there is not enough evidence in this field to rule out that Mr. Quine will not suffer from further suicide attempts.

28.     In *Michelle  Kosilek  v.  Luis  Spencer,  Commissioner  of  the Massachusetts Department of  Correction,* the lower court ruled that Kosilek had a right to sex reassignment surgery as a medical necessity.  On appeal from a special panel, the Court ruled that Kosilek, who attempted several times to kill and castrate himself, denied Kosilek's surgery, mainly due to the unsafe surrounding for both Kosilek  and  the  women  he  would  be  housed  with.    Additionally,  and  more

importantly, the special panel added that an inmate receiving **minimal medical care was adequate**, thus, providing Kosilek with female attire and make-up was sufficient.  The Court offered Mr. Kosilek suicide therepy.  It is unknown if Mr. Kosilek is receiving such therapy or the outcome of such therapy but he remains alive.

29.  This court should recognize that Mr. Quine is an inmate and that he lost privileges when he murdered Plaintiff's father and became incarcerated in the California State Prison system for a term of life.  Providing Mr. Quine with minimal medical care is all that is required under the laws of California.  That minimum requirement has already been met--Mr. Quine has access to therapy, female attire and make-up.  For the State to pay for and grant an inmate rights to receive sex reassignment surgery, is granting an inmate the same rights as that of the public.  Just as the State guards and sanctifies the policies on marriage, it should guard and sanctify the privileges that are lost when a person commits a terrible crime and is sentenced to a life term of prison, such as full medical care, which is allotted to those of us who have broken no laws that would cause us to become inmates of the State of California.

30.  There are other remedies available to Mr. Quine other than sex reassignment surgery that don't involve the *Quine* case to become precedent and opening the floodgates for taxpayers to pay for inmates sex reassignment surgeries.  The elephant in the room is that there is an expectation that some inmates who are incarcerated and who are not around women, would have an attraction to men.  If Mr. Quine has a desire to become a woman then it can be inferred that Mr. Quine is attracted to men.  This should not mean that Quine then should become a women.

31.  There are several experts in the transgender field that will verify that sex reassignment surgery can cause more harm, including what may have been thought to prevent suicide—sex reassignment surgery—in fact, caused it anyway.

32. The Court has the inherent power to stay Mr. Quine's sex reassignment surgery and determine if there is an alternative treatment available to Mr. Quine. Plaintiff has spelled out for this Court other alternatives and for the Court to ignore these alternatives makes Plaintiff believe, and possible the public, that the Court wants to open the floodgates for these types of lawsuits which will predictably happen, if the Court allows Mr. Quine, an inmate, to have this surgery.

33. Plaintiff will be directly harmed because the man who murdered her father will become unrecognizable as a woman and a potential name change will violate plaintiff's rights to justice and due process.

**WHEREFORE,** Plaintiffs pray for judgment against Defendants on all causes of action as follows:

1. For a declaration that the Plaintiff's rights under Marsy's Law be enforced;

2. For issuance of a temporary restraining order, preliminary injunction and/or stay of the pending Settlement Agreement and Mr. Quine's sex reassignment surgery;

3. For costs of suit incurred herein; and

5. For such other and further relief as the Court deems just and proper.

DATED: October 22, 2015

By:

FARIDA BAIG
PLAINTIFF, IN PRO PER

# EXHIBIT 1



CA.gov | About CDCR | Featured Links | Contact Us

Search

HOME     CAREERS     PRISONS     VISITATION     REHABILITATION     PAROLE     JUVENILE     REPORTS     VICTIM SERVICES     NEWS



Office of Governor
Edmund G. Brown Jr.
Visit his Website

Secretary
Jeffrey Beard, Ph.D.
Visit his page

Proposition 47

## Victim's Bill of Rights 2009: Marsy's Law

On November 4, 2008, the People of the State of California approved Proposition 9, the Victims' Bill of Rights Act of 2008: Marsy's Law. This measure amended the California Constitution to provide additional rights to victims. This card contains specific sections of the Victims' Bill of Rights and resources. Crime victims may obtain additional information regarding Marsy's Law and local Victim Witness Assistance Center information by contacting the Attorney General's Victim Services Unit at 1-877-433-9069.

Marsy's Law also amended California Penal Code sections 3041.5 and 3043 in regards to lifer Parole Suitability Hearings. Click here for more information regarding these changes.

### California Constitution, Article I, Section 28(b)

(b) In order to preserve and protect a victim's rights to justice and due process, a victim shall be entitled to the following rights:

(1) To be treated with fairness and respect for his or her privacy and dignity, and to be free from intimidation, harassment, and abuse, throughout the criminal or juvenile justice process.

(2) To be reasonably protected from the defendant and persons acting on behalf of the defendant.

(3) To have the safety of the victim and the victim's family considered in fixing the amount of bail and release conditions for the defendant.

(4) To prevent the disclosure of confidential information or records to the defendant, the defendant's attorney, or any other person acting on behalf of the defendant, which could be used to locate or harass the victim or the victim's family or which disclose confidential communications made in the course of medical or counseling treatment, or which are otherwise privileged or confidential by law.

(5) To refuse an interview, deposition, or discovery request by the defendant, the defendant's attorney, or any other person acting on behalf of the defendant, and to set reasonable conditions on the conduct of any such interview to which the victim consents.

(6) To reasonable notice of and to reasonably confer with the prosecuting agency, upon request, regarding, the arrest of the defendant if known by the prosecutor, the charges filed, the determination whether to extradite the defendant, and, upon request, to be notified of and informed before any pretrial disposition of the case.

(7) To reasonable notice of all public proceedings, including delinquency proceedings, upon request, at which the defendant and the prosecutor are entitled to be present and of all parole or other post-conviction release proceedings, and to be present at all such proceedings.

(8) To be heard, upon request, at any proceeding, including any delinquency proceeding, involving a post-arrest release decision, plea, sentencing, post-conviction release decision, or any proceeding in which a right of the victim is at issue.

(9) To a speedy trial and a prompt and final conclusion of the case and any related post-judgment proceedings.

(10) To provide information to a probation department official conducting a presentence investigation

### Statewide & National Resources

Victim's Compensation Program

California Attorney General - Victim Services Unit

Rape, Abuse, Incest, National Network
1-800-656-HOPE

California Partnership to End Domestic Violence
1-800-524-4765

Center for Missing & Exploited Children
1-800-THE-LOST

National Center for Victims of Crime
1-800-394-2255

National Domestic Violence Hotline
1-800-799-SAFE (7233)

Parents of Murdered Children
1-888-818-POMC

» More Resources

### Victim Services

✉ Contact Email

☎ 1-877-256-6877

Victim Services Home
Adult Offenders
Juvenile Offenders
Request for Victim Services
Resources
Forms & Publications
Victim Rights
Marsy's Law
Training Opportunities
Links to the Law
Historical Landmarks
Contact the Office of Victim Services
News Archive

concerning the impact of the offense on the victim and the victim's family and any sentencing recommendations before the sentencing of the defendant.

(11) To receive, upon request, the pre-sentence report when available to the defendant, except for those portions made confidential by law.

(12) To be informed, upon request, of the conviction, sentence, place and time of incarceration, or other disposition of the defendant, the scheduled release date of the defendant, and the release of or the escape by the defendant from custody.

(13) To restitution.

(A) It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer.

(B) Restitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss.

(C) All monetary payments, monies, and property collected from any person who has been ordered to make restitution shall be first applied to pay the amounts ordered as restitution to the victim.

(14) To the prompt return of property when no longer needed as evidence.

(15) To be informed of all parole procedures, to participate in the parole process, to provide information to the parole authority to be considered before the parole of the offender, and to be notified, upon request, of the parole or other release of the offender.

(16) To have the safety of the victim, the victim's family, and the general public considered before any parole or other post-judgment release decision is made.

(17) To be informed of the rights enumerated in paragraphs (1) through (16).

**SOURCE:** Office of the Attorney General - Victim Services Unit



# EXHIBIT 2

# FARIDA A. BAIG
## (ADDRESS NOT DISCLOSED)

August 13, 2015

## VIOLATION OF VICTIM'S RIGHTS UNDER MARCY'S LAW

### CONFIDENTIAL COMMUNICATION

### VIA E-MAIL AND/OR U.S. MAIL

Governor Jerry Brown
State of California
c/o State Capitol, Suite 1173
Sacramento, CA 95814
*Via Mail*

Honorable Jon S. Tigar
United States District Court
San Francisco Courthouse
Courtroom 9 - 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102
*Via Mail and E-Mail:*
jstpo@cand.uscourts.gov

Kamala D. Harris
CA State Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
*Via Mail*

Martine Noel D'Agostino
CA State Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
*Via Mail and E-Mail:*
martine.dagostino@doj.ca.gov

Re:   Shiloh Heavenly Quine v. Beard, et al.
USDC Case No. C 14-02726 JST

Dear Governor Brown, Honorable Tigar, Ms. Harris and Ms. D'Agostino:

I was listening to a radio station and was extremely upset to find that Rodney Quine has been allowed to receive a transgender operation. Mr. Quine is in prison for brutally murdering my father. With the likelihood that Mr. Quine's transgender operation would receive media attention, I am extremely upset that the State did not think enough about my family to inform us of what was coming. Instead, I had to hear it on a radio station. It would have been easy for the State to contact me, since my contact information is on file to receive parole hearing notifications for the co-defendant, who was also involved in my father's murder.

I called the radio station to find out more information and it was explained to me that Mr. Quine is mentally suffering from transgender dysphoria and that he filed a complaint against the State for not allowing him to have a transgender operation. This is disturbing.

I was even more disturbed when I realized that my tax dollars would help Mr. Quine have his transgender surgery. Why? Why is it necessary for Mr. Quine to have this surgery? What about the case law against transgender operations? Why were only two experts allowed testimony on behalf of Mr. Quine? The suffering that my family has endured as a result of Mr.

Quine brutally murdering my father will never be realized enough my Mr. Quine which is apparent through his actions. He has still not provided an apology letter to myself of other family members. The bottom line, as the victim's daughter, I was not heard to express these concerns.

**Under Marcy's Law, the following is stated:**

"(7) To reasonable notice of <u>all</u> public proceedings, including delinquency proceedings, upon request, at which the defendant and the prosecutor are entitled to be present and of all parole or other post-conviction release proceedings, and to be present at all such proceedings.

(8) **To be heard, upon request, at any proceeding**, including any delinquency proceeding, involving a post-arrest release decision, plea, sentencing, post-conviction release decision, <u>or any</u> proceeding in which a right of the victim is at issue."

I was not given the opportunity to be heard because nobody informed me that this proceeding was even taking place. The excuse that I could not be found doesn't stand, since my contact information is on file with the state to receive notification of parole hearings for Mr. Quine's co-defendant. I had and still have a right to be heard under Marsy's law.

I contacted Attorney's General's offices and spoke to two attorneys who had knowledge of the this case. I explained my concern and I was deeply upset as to how unsympathetic they were to anything I was telling them, even when I mentioned the murder of my father by Mr. Quine. Out of all the departments in the state of California, I thought the Attorney's General's office would be the place to start, especially with the following statement, that I took directly from the Attorney's General's website:

"Through the <u>Victims' Services Unit</u> (VSU), crime victims and their families are offered support and information to guide them through each stage of the criminal process. <u>Victims have rights, and the Attorney General is committed to ensuring that those rights are protected.</u> The VSU provides appeal notification to victims and their families, as well as assistance and outreach when the Attorney General's Office is prosecuting a case. To request to be notified of the status of an appeal that the Attorney General's Office is handling or on a case that the Attorney General's Office is prosecuting visit: <u>Marsy's Law - Victim Notification.</u>"

In 1980, Mr. Quine, along with his co-defendant, kidnapped my father, as he was coming home from work, and took my father's car at gunpoint. Mr. Quine and his co-defendant tied up my father and beat and assaulted him. According to court records and testimony, Mr. Quine then, along with his co-defendant, drove my father's car to an industrial area, in Gardena, and as Mr. Quine is dragging my father out of the car, my father is begging for his life. My father is pleading that Mr. Quine not take his life.

Instead, Mr. Quine puts my father on his knees, still tied up, and Mr. Quine and his co-defendant take turns and shoots my father in the head. According to testimony, Mr. Quine said, "I closed his shades." As Mr. Quine and his co-defendant were driving away, the headlights of my father's car shone on my father's body. Whether my father was still alive, even for a short time, causes me great emotional pain. Due to Mr. Quine's actions, my father was not allowed to

take another breath, my father's heart was not allowed another beat and my father's brain was not allowed another thought.

At the time of my father's murder, Mr. Quine was married to woman who later testified against Mr. Quine and helped put Mr. Quine in prison for life. I think this is telling that Mr. Quine was once married and that he did not experience transgenderism at the time he claims.

My request, as the victim's daughter is simple—my right to be heard under Marsy's Law. I would also request that the Settlement Agreement between the state and Mr. Quine be placed on hold until more counter information can be gathered by other experts in the field with knowledge of transgender dysphoria and, in the meantime, Mr. Quine attend deep extensive therapy to determine if a transgender operation is truly necessary.

Sincerely,

FARIDA BAIG

cc: Warden Joe A. Lizarraga
    Department of Corrections, Mule Creek State Prison (via mail)

# EXHIBIT 3

# Obtaining Credentials to Attend High-Demand Proceedings

All proceedings are open to members of the public and the media. In cases in which there is a great deal of public and media interest, special seating arrangements may be required. Check the court's website for further information regarding the specific case or contact the court's Media Liaison (415-522-4051).

# EXHIBIT 4

# U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:14-cv-02726-JST

Quine v. Beard et al
Assigned to: Hon. Jon S. Tigar
Referred to: Magistrate Judge Nandor J. Vadas (Settlement)
Demand: $0
Cause: 42:1983 Prisoner Civil Rights

Date Filed: 06/12/2014
Jury Demand: None
Nature of Suit: 555 Prisoner: Prison Condition
Jurisdiction: Federal Question

### Plaintiff

**Rodney James Quine**
#:C-34038
Mule Creek State Prison
P.O. Box 409020, FA5-242
Ione, CA 94579

represented by **Herman Joseph Hoying**
Morgan Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1126
415-442-1359
Fax: 415-442-1001
Email: hhoying@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher J. Banks**
Morgan Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1126
415-442-1000
Fax: 415-442-1001
Email: cbanks@morganlewis.com
*ATTORNEY TO BE NOTICED*

**Ilona Margaret Turner**
Transgender Law Center
1629 Telegraph Avenue, Suite 400
Oakland, CA 94612
415-865-0176
Fax: 877-847-1278
Email: ilona@transgenderlawcenter.org
*ATTORNEY TO BE NOTICED*

**Jennifer Orthwein**
Transgender Law Center
1629 Telegraph Avenue, Suite 400
Oakland, CA 94612
415-865-0176
Fax: 877-847-1278
Email: Jennifer.Orthwein@gmail.com

*ATTORNEY TO BE NOTICED*

**Megan Dy Lin**
Morgan Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1126
415-442-1137
Fax: 415-442-1001
Email: mlin@morganlewis.com
*ATTORNEY TO BE NOTICED*

**Shawn Thomas Meerkamper**
Transgender Law Center
1629 Telegraph Avenue, Suite 400
Oakland, CA 94612
415-865-0176
Fax: 877-847-1278
Email: shawn@transgenderlawcenter.org
*TERMINATED: 08/17/2015*

V.

**Defendant**

**Edmund G. Brown**
*Governor*
*TERMINATED: 12/10/2014*

**Defendant**

**Grounds**
*Warden, Salinas Valley State Prison*
*TERMINATED: 12/10/2014*

represented by **Preeti Kaur Bajwa**
California State Attorney General's
Office
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
415-703-1621
Fax: 415-703-5843
Email: preeti.bajwa@doj.ca.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**J. Walker**
*Chief Medical Health Care Services*
*TERMINATED: 12/10/2014*

represented by **Martine Noel D'Agostino**
CA State Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
415-703-5233
Fax: 415-703-5843
Email: martine.dagostino@doj.ca.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**P. Didbal**
*TERMINATED: 12/10/2014*

**Defendant**

**L. D. Zamora**
*Chief California Correctional Health
Care Services*
*TERMINATED: 12/10/2014*

**Defendant**

**Jeffrey Beard**                          represented by **Martine Noel D'Agostino**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Preeti Kaur Bajwa**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**S. Pajong, M.D.**                        represented by **Martine Noel D'Agostino**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Preeti Kaur Bajwa**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Doctor D. Bright**                       represented by **Martine Noel D'Agostino**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Preeti Kaur Bajwa**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dr. J. Dunlap**                          represented by **Martine Noel D'Agostino**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Preeti Kaur Bajwa**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**J. Lewis**                        represented by    **Martine Noel D'Agostino**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Preeti Kaur Bajwa**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/12/2014 | 1 | COMPLAINT Under The Civil Rights Act, 42 U.S.C. Section 1983 - [No Summons Issued] against Edmund G. Brown, P. Didbal, Grounds, J. Walker & L. D. Zamora, [Filing Fee: Ifpp entered on 6/12/2014] Filed by Rodney James Quine. (Attachments: #(1) Exhibits, #(2) Envelope) (tnS) (Filed on 6/12/2014) (Entered: 06/13/2014) |
| 06/12/2014 | 2 | Prisoner's Application for Leave to Proceed in Forma Pauperis filed by Rodney James Quine. (tnS) (Filed on 6/12/2014) (Entered: 06/13/2014) |
| 06/17/2014 | 3 | **ORDER DIRECTING CLERK TO REASSIGN THE ACTION TO A MAGISTRATE JUDGE. Signed by Judge Jon S. Tigar on June 17, 2014. (Attachments: # 1 Certificate/Proof of Service)(wsn, COURT STAFF) (Filed on 6/17/2014) (Entered: 06/17/2014)** |
| 06/18/2014 | 4 | Mailed letter to plaintiff regarding his two open cases; included a blank civil rights form and IFP application. (ljf, COURT STAFF) (Filed on 6/18/2014) (Entered: 06/18/2014) |
| 06/19/2014 | 5 | **ORDER REASSIGNING CASE 3 . Case reassigned to Judge Magistrate Judge Nathanael M. Cousins for all further proceedings. Judge Hon. Jon S. Tigar no longer assigned to the case. Signed by Executive Committee on 6/19/14. (sv, COURT STAFF) (Filed on 6/19/2014) (Entered: 06/19/2014)** |
| 07/23/2014 | 6 | **ORDER VACATING REFERRAL TO MAGISTRATE JUDGE; DIRECTING CLERK TO REASSIGN ACTION BACK TO DISTRICT JUDGE TIGAR. Signed by Judge Jon S. Tigar on July 23, 2014. (Attachments: # 1 Certificate/Proof of Service)(wsn, COURT STAFF) (Filed on 7/23/2014) (Entered: 07/23/2014)** |
| 07/24/2014 | 7 | **ORDER REASSIGNING CASE 6 . Case reassigned to Judge Hon. Jon S. Tigar for all further proceedings. Magistrate Judge Nathanael M. Cousins no longer assigned to the case. Signed by Magistrate Judge Nathanael Cousins on 7/24/14. (sv, COURT STAFF) (Filed on 7/24/2014) (Entered: 07/24/2014)** |

| 08/19/2014 | 8 | NOTICE of Change of Address : P.O. Box 2000, Vacaville, CA 95696-2000 by Rodney James Quine. (mclS, COURT STAFF) (Filed on 8/19/2014) (Entered: 08/20/2014) |
|---|---|---|
| 08/29/2014 | 9 | **ORDER GRANTING LEAVE TO PROCEED IN FORMA PAUPERIS by Judge Jon S. Tigar granting 2 Motion for Leave to Proceed in forma pauperis. (Attachments: # 1 Certificate/Proof of Service) (wsn, COURT STAFF) (Filed on 8/29/2014) (Entered: 08/29/2014)** |
| 08/29/2014 | 10 | **ORDER OF DISMISSAL WITH LEAVE TO AMEND; REFERRING MATTER TO FEDERAL PRO BONO PROJECT AND STAYING PROCEEDINGS PENDING APPOINTMENT OF COUNSEL. Signed by Judge Jon S. Tigar on August 29, 2014. (Attachments: # 1 Certificate/Proof of Service)(wsn, COURT STAFF) (Filed on 8/29/2014) (Entered: 08/29/2014)** |
| 09/02/2014 | | Sent by INTER-OFFICE MAIL a copy of 10 Order, a copy of 1 Complaint, a copy of the civil docket to the Pro Bono Department. Re 10 Order (aaaS, COURT STAFF) (Filed on 9/2/2014) (Entered: 09/02/2014) |
| 09/08/2014 | 11 | MOTION To Add to the Civil Rights Complaint filed by Rodney James Quine. Responses due by 10/6/2014. Replies due by 10/20/2014. (tnS) (Filed on 9/8/2014) (Entered: 09/08/2014) |
| 09/10/2014 | 12 | **ORDER APPOINTING COUNSEL; DENYING WITHOUT PREJUDICE MOTION TO ADD TO COMPLAINT by Judge Jon S. Tigar denying 11 Motion To Add to the Civil Rights Complaint. (Attachments: # 1 Certificate/Proof of Service) (wsn, COURT STAFF) (Filed on 9/10/2014) (Entered: 09/10/2014)** |
| 09/11/2014 | 13 | NOTICE filed by Rodney James Quine. (tnS) (Filed on 9/11/2014) (Entered: 09/12/2014) |
| 09/15/2014 | 14 | NOTICE of Change of Address filed by Rodney James Quine. (tnS) (Filed on 9/15/2014) (Entered: 09/16/2014) |
| 09/25/2014 | 15 | NOTICE of Change of Address; by Rodney James Quine (aaa, COURT STAFF) (Filed on 9/25/2014) (Entered: 09/30/2014) |
| 12/10/2014 | 16 | AMENDED COMPLAINT - *First Amended Complaint* against Jeffrey Beard, S. Pajong, M.D., D. Bright, J. Dunlap, J. Lewis. Filed by Rodney James Quine. (Hoying, Herman) (Filed on 12/10/2014) (Entered: 12/10/2014) |
| 12/19/2014 | 17 | **ORDER REQUIRING MARSHAL TO SERVE PROCESS re 16 Amended Complaint filed by Rodney James Quine. Signed by Judge Jon S. Tigar on December 19, 2014. (wsn, COURT STAFF) (Filed on 12/19/2014) (Entered: 12/19/2014)** |
| 12/22/2014 | 18 | Summons Issued as to Jeffrey Beard, D. Bright, Edmund G. Brown, P. Didbal, J. Dunlap, Grounds, J. Lewis, S. Pajong, M.D., J. Walker, L. D. Zamora. (aaaS, COURT STAFF) (Filed on 12/22/2014) (Entered: 12/22/2014) |
| 01/05/2015 | 19 | Acknowledgment of Receipt from United States Marshals Service of Summons & Amended Complaint. (tnS) (Filed on 1/5/2015) (Entered: 01/07/2015) |

| 01/07/2015 | 20 | Letter from R. Shiloh Quine, dated 1/1/2015 to Ms. Krupski re First Amended Complaint. (tnS) (Filed on 1/7/2015) (Entered: 01/08/2015) |
| 01/31/2015 | 21 | CLERK'S NOTICE SETTING CASE MANAGEMENT CONFERENCE. A Case Management Conference is set for 2/25/2015 at 02:00 PM in Courtroom 9, 19th Floor, San Francisco. *This is a text only entry. There is no document associated with this notice.* (wsn, COURT STAFF) (Filed on 1/31/2015) (Entered: 01/31/2015) |
| 02/05/2015 | 22 | NOTICE filed by J. Dunlap of *Notice and Acknowledgment of Receipt of Summons and Complaint by Mail* (Bajwa, Preeti) (Filed on 2/5/2015) (Entered: 02/05/2015) |
| 02/05/2015 | 23 | NOTICE filed by D. Bright of *Notice and Acknowledgment of Receipt of Summons and Complaint by Mail* (Bajwa, Preeti) (Filed on 2/5/2015) (Entered: 02/05/2015) |
| 02/05/2015 | 24 | NOTICE filed by S. Pajong, M.D. of *Notice and Acknowledgment of Receipt of Summons and Complaint by Mail* (Bajwa, Preeti) (Filed on 2/5/2015) (Entered: 02/05/2015) |
| 02/05/2015 | 25 | NOTICE filed by Grounds of *Notice and Acknowledgment of Receipt of Summons and Complaint by Mail* (Bajwa, Preeti) (Filed on 2/5/2015) (Entered: 02/05/2015) |
| 02/05/2015 | 26 | NOTICE filed by Jeffrey Beard of *Notice and Acknowledgment of Receipt of Summons and Complaint by Mail* (Bajwa, Preeti) (Filed on 2/5/2015) (Entered: 02/05/2015) |
| 02/05/2015 | 27 | NOTICE filed by J. Lewis of *Notice and Acknowledgment of Receipt of Summons and Complaint by Mail* (Bajwa, Preeti) (Filed on 2/5/2015) (Entered: 02/05/2015) |
| 02/06/2015 | 28 | Answer to First Amended Complaint filed by Jeffrey Beard, D. Bright, J. Dunlap, J. Lewis, S. Pajong, M.D.. (Bajwa, Preeti) (Filed on 2/6/2015) (Entered: 02/06/2015) |
| 02/06/2015 | 29 | STIPULATION WITH [PROPOSED] ORDER re 16 First Amended Complaint, re 17 Order of Service; *Stipulation Regarding Defendants Named in First Amended Complaint* filed by Jeffrey Beard, D. Bright, J. Dunlap, J. Lewis, S. Pajong, M.D.. (Bajwa, Preeti) (Filed on 2/6/2015) (Entered: 02/06/2015) |
| 02/10/2015 | 30 | JOINT CASE MANAGEMENT STATEMENT and *[Proposed] Order* filed by Jeffrey Beard, D. Bright, J. Dunlap, J. Lewis, S. Pajong, M.D.. (Attachments: # 1 Certificate/Proof of Service)(Bajwa, Preeti) (Filed on 2/10/2015) (Entered: 02/10/2015) |
| 02/10/2015 | 31 | Certificate of Interested Entities by Rodney James Quine; *Certification of Interested Entities or Persons* (Hoying, Herman) (Filed on 2/10/2015) (Entered: 02/10/2015) |
| 02/10/2015 | 32 | **STIPULATION AND ORDER re 29 STIPULATION WITH PROPOSED ORDER re 16 Amended Complaint, 17 Order of Service; *Stipulation Regarding Defendants Named in First Amended Complaint* filed by S. Pajong, M.D., D. Bright, J. Dunlap, Jeffrey Beard, J. Lewis. Signed by Judge Jon S. Tigar on February 10, 2015. (wsn, COURT STAFF) (Filed on 2/10/2015) (Entered: 02/10/2015)** |
| 02/25/2015 | 33 | **Minute Entry for proceedings held before Hon. Jon S. Tigar: Initial Case Management Conference held on 2/25/2015. Further Case Management Conference set for 7/22/2015 at 2:00 PM in Courtroom 9, 19th Floor, San** |

| | | Francisco. Final Pretrial Conference set for 12/11/2015 at 2:00 PM in Courtroom 2, 4th Floor, Oakland. Bench Trial set for 1/4/2016 at 8:30 AM before Hon. Jon S. Tigar.Court Reporter: Not reported. (wsn, COURT STAFF) (Date Filed: 2/25/2015) (Entered: 02/25/2015) |
|---|---|---|
| 02/25/2015 | 34 | **SCHEDULING ORDER. Final Pretrial Conference set for 12/11/2015 at 2:00 PM in Courtroom 2, 4th Floor, Oakland. Bench Trial set for 1/4/2016 - 1/20/2016 at 8:30 AM before Hon. Jon S. Tigar. Signed by Judge Jon S. Tigar on February 25, 2015. (wsn, COURT STAFF) (Filed on 2/25/2015) (Entered: 02/26/2015)** |
| 05/22/2015 | 35 | NOTICE of Appearance by Megan Dy Lin; *-Notice of Apperaance of Co-Counsel for Plaintiff* (Lin, Megan) (Filed on 5/22/2015) (Entered: 05/22/2015) |
| 06/03/2015 | 36 | STIPULATION WITH [PROPOSED] ORDER *for Rule 35 Independent Medical Examination of Plaintiff* filed by Jeffrey Beard, D. Bright, J. Dunlap, J. Lewis, S. Pajong, M.D.. (Bajwa, Preeti) (Filed on 6/3/2015) (Entered: 06/03/2015) |
| 06/04/2015 | 37 | **STIPULATION AND ORDER re 36 STIPULATION WITH PROPOSED ORDER *for Rule 35 Independent Medical Examination of Plaintiff* filed by S. Pajong, M.D., D. Bright, J. Dunlap, Jeffrey Beard, J. Lewis. Signed by Judge Jon S. Tigar on June 4, 2015. (wsn, COURT STAFF) (Filed on 6/4/2015) (Entered: 06/04/2015)** |
| 06/15/2015 | 38 | NOTICE of Appearance by Martine Noel D'Agostino (D'Agostino, Martine) (Filed on 6/15/2015) (Entered: 06/15/2015) |
| 07/01/2015 | 39 | STIPULATION WITH [ROPOSED] ORDER *for Extension of Discovery Deadlines; Request for Referral to Magistrate Judge Vadas for Settlement Conference* filed by Jeffrey Beard, D. Bright, J. Dunlap, S. Pajong, M.D.. (D'Agostino, Martine) (Filed on 7/1/2015) (Entered: 07/01/2015) |
| 07/02/2015 | 40 | **STIPULATION AND ORDER re 39 STIPULATION WITH PROPOSED ORDER *for Extension of Discovery Deadlines; Request for Referral to Magistrate Judge Vadas for Settlement Conference* filed by S. Pajong, M.D., D. Bright, J. Dunlap, Jeffrey Beard. Signed by Judge Jon S. Tigar on July 2, 2015. (wsn, COURT STAFF) (Filed on 7/2/2015) (Entered: 07/02/2015)** |
| 07/06/2015 | | CASE REFERRED to Magistrate Judge Nandor J. Vadas for Settlement (ahm, COURT STAFF) (Filed on 7/6/2015) (Entered: 07/06/2015) |
| 07/08/2015 | 41 | **Order Setting Settlement Conference before Magistrate Judge Vadas. Video Settlement Conference set for 7/24/2015 10:00 AM. Telephonic Status Conference set for 7/21/2015 01:00 PM before Magistrate Judge Nandor J. Vadas. Signed by Judge Nandor Vadas on 7/8/2015. (njvlc1, COURT STAFF) (Filed on 7/8/2015) (Entered: 07/08/2015)** |
| 07/08/2015 | 42 | CASE MANAGEMENT STATEMENT; *-JOINT CASE MANAGEMENT CONFERENCE STATEMENT* filed by Rodney James Quine. (Hoying, Herman) (Filed on 7/8/2015) (Entered: 07/08/2015) |
| 07/10/2015 | 43 | **Minute Entry for proceedings held before Hon. Jon S. Tigar: Telephonic Case Management Conference held on 7/10/2015. Court Reporter: Not reported. (wsn, COURT STAFF) (Date Filed: 7/10/2015) (Entered: 7/10/2015)** |

| 07/15/2015 | 44 | CLERK'S NOTICE. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* The Settlement Conference previously set for July 24, 2015 is reset to July 28, 2015 at 11:00 a.m. in Courtroom D. (glm, COURT STAFF) (Filed on 7/15/2015) (Entered: 07/15/2015) |
| --- | --- | --- |
| 07/15/2015 | 45 | **ORDER CONTINUING CASE MANAGEMENT CONFERENCE** The Case Management Conference currently scheduled for July 22, 2015 is continued to July 29, 2015 at 2:30 p.m. to permit the parties to complete their scheduled settlement conference with Judge Vadas on July 24, 2015. An updated case management is not required. Please note the later start time of this conference. (Entered by Judge Jon S. Tigar) (Filed on 7/15/2015) (Entered: 07/15/2015) |
| 07/15/2015 | | Set Deadlines/Hearings: Further Case Management Conference set for 7/29/2015 at 2:30 PM in Courtroom 9, 19th Floor, San Francisco. (wsn, COURT STAFF) (Filed on 7/15/2015) (Entered: 07/15/2015) |
| 07/20/2015 | 46 | CLERK'S NOTICE. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* The status conference previously set for July 21, 2015 is VACATED. Settlement Conference Statements are due July 23, 2015 no later than 5:00 p.m. (glm, COURT STAFF) (Filed on 7/20/2015) (Entered: 07/20/2015) |
| 07/28/2015 | 47 | CLERK'S NOTICE CONTINUING CASE MANAGEMENT CONFERENCE. The Case Management Conference previously set for 7/29/2015 is continued to 10/28/2015 at 2:00 PM in Courtroom 9, 19th Floor, San Francisco. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (wsn, COURT STAFF) (Filed on 7/28/2015) (Entered: 07/28/2015) |
| 08/05/2015 | 48 | CLERK'S NOTICE. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* Further Settlement Conference set for 8/11/2015 10:00 AM. Parties will appear by phone by dialing 888-684-8852 and entering access code 1868782. (glm, COURT STAFF) (Filed on 8/5/2015) (Entered: 08/05/2015) |
| 08/07/2015 | 49 | NOTICE filed by Jeffrey Beard, D. Bright, J. Dunlap, J. Lewis, S. Pajong, M.D. re *Joint Notice of Settlement Agreement* (D'Agostino, Martine) (Filed on 8/7/2015) (Entered: 08/07/2015) |
| 08/11/2015 | 50 | **Minute Entry for proceedings held before Magistrate Judge Nandor J. Vadas: Settlement Conference held on 7/28/2015.FTR Time: 4:28-4:40. Plaintiff Attorney: Herman J. Hoying, Esq.; Megan Lin, Esq.. Defendant Attorney: Jay C. Russell, Deputy Att. General; Ned Fluet, Deputy Atty. General; Martine N. D'Agostino, Deputy Atty. General; Thomas L. Gilevich Assistant Chief Counsel. Interpreter: None Needed.Attachment: Minutes of Settlement Conference; Settlement held, Case settled in full.(rmm2S, COURT STAFF) (Date Filed: 8/11/2015) (PLEASE NOTE: At the request of NJV Minutes held until after 8/7/2015 - delay in posting.) (Entered: 08/11/2015)** |
| 08/11/2015 | 51 | **Minute Entry for proceedings held before Magistrate Judge Nandor J. Vadas: Status Conference held on 8/11/2015. FTR Time 1:09-1:10. Attachment Minutes.(glm, COURT STAFF) (Date Filed: 8/11/2015) (Entered: 08/11/2015)** |
| 08/14/2015 | 52 | NOTICE of Change In Counsel by Shawn Thomas Meerkamper (Meerkamper, Shawn) (Filed on 8/14/2015) (Entered: 08/14/2015) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/09/2015 13:05:50 | | | |
| **PACER Login:** | Prenovost2122:2615729:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:14-cv-02726-JST |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |

# EXHIBIT 5

1    KAMALA D. HARRIS
     Attorney General of California
2    JAY C. RUSSELL
     Supervising Deputy Attorney General
3    MARTINE N. D'AGOSTINO
     Deputy Attorney General
4    State Bar No. 256777
       455 Golden Gate Avenue, Suite 11000
5      San Francisco, CA  94102-7004
       Telephone:  (415) 703-5233
6      Fax:  (415) 703-5843
       E-mail:  Martine.DAgostino@doj.ca.gov
7    *Attorneys for Defendants*
     *S. Pajong, D. Bright, J. Lewis, J. Dunlap, and*
8    *J. Beard, Ph.D.*

9

10                    IN THE UNITED STATES DISTRICT COURT

11                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                           SAN FRANCISCO DIVISION

13

| | |
|---|---|
| 14   **SHILOH HEAVENLY QUINE,** | C 14-02726 JST |
| 15                                          Plaintiffs, | **JOINT NOTICE OF SETTLEMENT AGREEMENT** |
| 16                      **v.** | |
| 17   **BEARD, et al.,** | Judge:          The Honorable Jon S. Tigar |
| 18                                          Defendants. | Trial Date:     January 4, 2016 |
| 19   | Action Filed:  June 12, 2014 |

20

21

22

23

24

25

26

27

28

1    The parties, by and through their counsel of record, have agreed to settle the instant matter.

2    The parties will execute the attached Settlement Agreement and Release within the next seven

3    calendar days.

4    DATED: August 7, 2015

5

6    /s/ Herman J. Hoying                        /s/ Martine N. D'Agostino

7    _____               _____
     HERMAN J. HOYING[1]                         MARTINE N. D'AGOSTINO
8    *Attorney for Plaintiff*                    Deputy Attorney General
     *Shiloh Quine (aka Rodney James Quine)*     *Attorney for Defendants*
9                                                *S. Pajong, D. Bright, J. Lewis, J.*
                                                 *Dunlap, and J. Beard, Ph.D.*
10

11
     SF2015400052
12   20769978.doc

13

14

15

16

17

18

19

20

21

22

23

24

25

26   _____
27   [1] Under Northern District Local Rule 5-1(i)(3), counsel for Defendants attests that
     Plaintiff's counsel gave his permission to electronically sign this stipulation on his behalf.

28

                                            2

# SETTLEMENT AGREEMENT AND RELEASE

## I. PARTIES

This Settlement Agreement and Release (Agreement) is made between SHILOH HEAVENLY (aka Rodney James) QUINE (Plaintiff) and the California Department of Corrections and Rehabilitation (CDCR) on behalf of Defendants BEARD, PAJONG, LEWIS, BRIGHT, and DUNLAP (Defendants). Plaintiff, CDCR, and Defendants are referred to as "the parties." This Agreement covers all of the claims and allegations in the Complaint and any amendments in it against Defendants, whether named or unnamed and whether served or unserved, and any past or current CDCR employees.

## II. RECITALS

Plaintiff filed a complaint in the United States District Court for the Northern District of California, *RODNEY JAMES QUINE v. BEARD, et al.*, Case No. C 14-02726 JST (N.D. Cal.) (the Complaint), seeking an order requiring Defendants to provide Plaintiff with sex-reassignment surgery as a medically necessary treatment for her gender dysphoria and access to property available to CDCR inmates housed in female facilities. Defendants and CDCR deny all allegations of wrongdoing made by Plaintiff in this lawsuit. However, the parties acknowledge that several medical and mental health clinicians, including two independent mental health experts, have determined that sex-reassignment surgery is a medically necessary treatment for Plaintiff. (See Attachments A & B.) No medical or mental health clinician has indicated otherwise. Accordingly, the parties now desire and intend by this Agreement to settle all disputes between them relating in any way to the Complaint's allegations and claims, including any rights to appeal, and to discharge each other from any and all liability with reference to such allegations and claims, except as specifically set forth in this Agreement.

Therefore, in consideration of the covenants set forth in this Agreement, the parties settle their dispute on the terms and conditions set forth below.

## III. TERMS AND CONDITIONS

1.  In full and complete settlement of any and all claims, the parties agree to the following:

> A. As promptly as possible, Plaintiff shall be referred for genital sex-reassignment surgery to a mutually agreed-upon surgical practice (the surgical practice). CDCR shall negotiate the contract with the surgical practice, who shall provide Plaintiff's genital sex-reassignment surgery.
>
> B. The surgical practice shall evaluate Plaintiff for genital sex-reassignment surgery, i.e. surgery to transform the appearance and function of Plaintiff's genitals to appear as female.
>
> C. If the surgical practice determines that Plaintiff is not a candidate for genital sex-reassignment surgery, that determination shall be delivered to all parties.

Plaintiff shall then be re-evaluated by a second mutually agreed-upon surgical practice for a second evaluation and surgery.

D. Plaintiff's genital sex-reassignment surgery shall proceed under the surgical practice's recommendations.

E. Following completion of genital sex-reassignment surgery, it is anticipated that Plaintiff will require a period of post-surgery hospitalization and recovery. Following discharge, Plaintiff shall be placed as a female inmate in a CDCR facility that houses female inmates consistent with Plaintiff's custody and classification factors.

F. Plaintiff shall be issued a correctional chrono allowing her access to property items available to CDCR inmates consistent with her custody and classification factors, including property items that are designated as available to female inmates only.

G. CDCR shall review and revise its policies to allow inmates identified by medical or CDCR personnel as transgender or having symptoms of gender dysphoria access to property items available to CDCR inmates consistent with those inmates' custody and classification factors, including property items that are designated as available to a specific gender only. Before those policies are final, Plaintiff shall have the opportunity to comment on its specific language, including provisions that limit certain property because of safety and security concerns. In addition, CDCR is reviewing and revising its policies concerning medically necessary treatment for gender dysphoria, including surgery.

H. The Court shall retain jurisdiction of this litigation while this Agreement's terms are being executed. Any disputes between the parties concerning this Agreement shall first be presented to Magistrate Judge Nandor J. Vadas for informal dispute resolution without prejudice to a party's right to seek formal relief from the Court.

I. Upon execution of all of this Agreement's terms, Plaintiff agrees to dismiss the Complaint with prejudice.

2. There are no other actions required by Defendants or CDCR to comply with this Agreement. Except as described in Paragraph 1.G. above, any and all actions taken under this Agreement shall be limited in scope and application to this case and Plaintiff only.

3. Plaintiff shall be entitled to reasonable attorney's fees and costs incurred in this litigation at the rate applicable under the Prison Litigation Reform Act.

## IV. GENERAL RELEASE

4. By signing this Agreement, the parties intend that it shall be a full and final accord and satisfaction and release from all allegations and claims asserted in the Complaint.

---

*SHILOH QUINE v. BEARD, et al.*, Case No. C 14-02726 JST
Settlement Agreement and Release

A. By signing this Agreement, Plaintiff releases CDCR, Defendants, California Correctional Health Care Services (CCHCS), whether named or unnamed and whether served or unserved, and any other past or current CDCR and CCHCS employees, including the receiver appointed in *Plata v. Brown,* Case No. C01-1351 TEH (N.D. Cal.), from all claims, past, present and future, known or unknown, that arise or could arise from the facts alleged in the Complaint or from this lawsuit.

B. By signing this Agreement, CDCR, Defendants, California Correctional Health Care Services (CCHCS), whether named or unnamed and whether served or unserved, and any other past or current CDCR and CCHCS employees, including the receiver appointed in *Plata v. Brown,* Case No. C01-1351 TEH (N.D. Cal.), release Plaintiff from all claims, past, present and future, known or unknown, that arise or could arise from the facts alleged in the Complaint or this lawsuit.

5.      In furtherance of this intention, the parties acknowledge that they are familiar with, and expressly waive, the provisions of California Civil Code section 1542, which states:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

6.      This Agreement is the compromise of various disputed claims and shall not be treated as an admission of liability by any of the parties for any purpose. The signature of or on behalf of the respective parties does not indicate or acknowledge the validity or merits of any claim or demand of the other party.

## V. SUCCESSORS AND ASSIGNS

7.      This Agreement shall be binding on the parties and their respective officers, agents, administrators, successors, assignees, heirs, executors, trustees, attorneys, consultants, and any committee or arrangement of creditors organized with respect to the affairs of any such party.

## VI. REPRESENTATIONS AND WARRANTIES

8.      No other consideration. The consideration recited in this Agreement is the only consideration for this Agreement, and no representations, promises, or inducements have been made to the parties, or any of their representatives, other than those set forth in this Agreement.

9.      Execution in counterpart. This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.    <u>Execution of further documents</u>. Each party to this Agreement shall complete, execute or cause to be executed such further and other documents as are necessary to carry out the expressed intent and purpose of this Agreement.

11.    <u>Entire agreement</u>. This Agreement constitutes a single, integrated agreement expressing the entire agreement of the parties, and there are no other agreements, written or oral, express or implied, between the parties, except as set forth in this Agreement.

12.    <u>No oral modifications or waiver</u>. No supplement, modification, or amendment to this Agreement shall be binding unless executed in writing by all the parties. No waiver of any provision of this Agreement shall be binding unless executed in writing by the party making the waiver. No waiver of any provision of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.

13.    <u>Governing law</u>. Unless expressly stated otherwise in this Agreement, the terms, conditions, and provisions of this Agreement are governed by and interpreted under California state law.

14.    <u>Severability</u>. Should any provision of this Agreement be held invalid or illegal, such illegality shall not invalidate the whole of this Agreement, but the Agreement shall be construed as if it did not contain the illegal part, and the rights and obligations of the parties shall be construed and enforced accordingly.

The undersigned agree to the above:

Dated: _____    By: _____
                                 Shiloh Quine


Dated: _____    By: _____
                                 Dr. Jeffrey Beard
                                 Secretary, California Department of Corrections and
                                 Rehabilitation

Approved as to form:

Dated: **8/07/15**          By: _____
                                 Herman J. Hoying
                                 Morgan, Lewis & Bockius

Dated: August 7 2015        By: _____
                                 Jay C. Russell, Supervising Deputy Attorney
                                 General
                                 Counsel for Defendants

---

*SHILOH QUINE v. BEARD, et al.*, Case No. C 14-02726 JST
Settlement Agreement and Release

# ATTACHMENT A

1

2

3

4

5

6

7

8

9                          UNITED STATES DISTRICT COURT

10                         NORTHERN DISTRICT OF CALIFORNIA

11

12  SHILOH QUINE (a/k/a RODNEY JAMES        Case No. C 14-02726 JST
    QUINE),

13                 Plaintiff,               **EXPERT DECLARATION OF DR. RANDI**
                                            **C. ETTNER**
14            v.

15  JEFFREY BEARD; S. PAJONG; D.
    BRIGHT; J. DUNLAP; J. LEWIS; and DOES
16  1-30,
                   Defendants.
17

18

19         1.     I, Randi C. Ettner, have been retained by Plaintiff Shiloh Quine, by and through

20  counsel, to provide my expert evaluation and opinion regarding Ms. Quine's mental health

21  condition and the appropriateness of the mental health treatment provided to Ms. Quine by the

22  California Department of Corrections and Rehabilitation ("CDCR"), including through the named

23  defendants in this lawsuit, whom I understand to have been CDCR employees or agents during

24  the relevant period.  This declaration provides my opinions and conclusions, including (i)

25  scientific information regarding gender dysphoria and its impact on the health and well-being of

26  individuals inflicted with it; (ii) information regarding best practices and the generally accepted

27  standards of care for individuals with gender dysphoria, including the efficacy of sex

28  reassignment surgery as a treatment for gender dysphoria; and (iii) the results of my evaluation of

1    Ms. Quine and recommendations with regard to her treatment. I have actual knowledge of the

2    matters stated herein and could and would so testify if called as a witness.

3    **I.   QUALIFICATIONS**

4         2.     I received my doctorate in psychology from Northwestern University in 1979. I

5    have been involved in treating patients with gender dysphoria[1] since 1977, when I was an intern

6    at the Cook County Hospital.

7         3.     Since that time I have developed significant experience and expertise in the

8    treatment of individuals with gender dysphoria. In 2005, I was involved in establishing the

9    Chicago Gender Center, which specializes in the treatment of individuals with gender dysphoria,

10    and have served as the chief psychologist at the Chicago Gender Center since 2005.

11         4.     During the course of my career, I have evaluated and/or treated between 2,500 and

12    3,000 individuals with gender dysphoria and mental health issues related to gender variance.

13         5.     I have published three books related to the treatment of individuals with gender

14    dysphoria, including the medical text entitled *Principles of Transgender Medicine and Surgery*

15    (co-editors Monstrey & Eyler; Routledge, 2007). In addition, I have authored numerous articles

16    in peer-reviewed journals regarding the provision of health care to this population. I have served

17    as a member of the University of Chicago Gender Board, and am a member of the editorial board

18    for the International Journal of Transgenderism.

19         6.     I am a member of the Board of Directors of the World Professional Association for

20    Transgender Health (WPATH) (formerly the Harry Benjamin International Gender Dysphoria

21    Association), and an author of the WPATH Standards of Care for the Health of Transsexual,

22    Transgender and Gender-nonconforming People (7th version), published in 2012.

23

24

25

26

27

28

---

[1] The American Psychiatric Association published a revised version of its Diagnostic and
Statistical Manual of Mental Disorders ("DSM-V") in 2013, which replaced the "gender identity
disorder" diagnosis with "gender dysphoria." For consistency, I will refer to the condition as
"gender dysphoria" throughout my report, even when making reference to the condition prior to
2013.

7.      I have lectured throughout North America and Europe on topics related to gender dysphoria. On numerous occasions, I have given grand rounds presentations on gender dysphoria at medical hospitals.

8.      I have been retained as an expert regarding gender dysphoria and the treatment of gender dysphoria in multiple court cases and administrative proceedings, including cases involving the treatment of individuals with gender dysphoria in prison settings. I was deposed as an expert in the following cases over the past four years: *Jane Doe v. Clenchy, et al.*, No. CV-09-201 (Me. Super. Ct. 2011); *Kothmann v. Rosario*, No. 13-CV-28-OC22 (D. Fla. 2013). In *Fields v. Smith*, No. 06-C-112 (E.D. Wisc. 2006), I provided testimony in court and was qualified as an expert.

9.      In addition, I have been a consultant to news media and have been interviewed as an expert on gender dysphoria for hundreds of television, radio and print articles throughout the country.

10.     My consulting fee in this case is $250 per hour.

11.     A true and correct copy of my Curriculum Vitae (CV), which provides a complete overview of my education, training, and work experience and a full list of my publications, is attached hereto as Exhibit A.

## II.     MATERIALS CONSIDERED

12.     I have considered information from various sources in forming my opinions enumerated herein, in addition to drawing on my extensive experience and review of the literature related to gender dysphoria over the past three decades. A complete bibliography of the materials referenced in this report is attached hereto as Exhibit B.

13.     I also have reviewed the deposition testimony provided by Ms. Quine in this case on June 10, 2015 and the following medical records of Ms. Quine that I understand to have been produced in this case:  AGO 000023,  AGO 003972-76,  AGO 003982-88,  AGO 004011-12, AGO 004015-18, AGO 004027, AGO 004066-115, AGO 004298-304, AGO 004309-12, AGO 004849-51, AGO 005607-867, AGO 005998-6075.

14.    In addition, I have reviewed the documents pertaining to Ms. Quine's appeal within CDCR seeking sex reassignment surgery (AGO 010549-83) and the assessment, dated April 11, 2014, prepared by Dr. B. Bloch (AGO 005894-99).

15.    Finally, in preparation for this report, I conducted an interview of Ms. Quine on June 9, 2015 at Mule Creek State Prison in Ione, California. During that interview, I conducted and subsequently reviewed and considered the following psychodiagnostic tests:

1.    Beck Depression Inventory-II,

2.    Beck Anxiety Inventory, and

3.    Beck Hopelessness Scale.

## III.    GENDER DYSPHORIA

16.    Gender dysphoria, formerly known as gender identity disorder (GID), is a serious medical condition codified in the International Classification of Diseases (10th revision; World Health Organization) and the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders–5th edition (DSM-V). The condition is characterized by an incongruence between one's experienced/expressed gender and assigned sex at birth, and clinically significant distress or impairment of functioning as a result. The suffering that arises from this condition has often been described as "being trapped in the wrong body." "Gender dysphoria" is also the psychiatric term used to describe the severe and unremitting emotional pain associated with the condition.

17.    The diagnostic criteria for gender dysphoria in adults are as follows:

A.    A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:

1.    A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics.

2.    A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender.

3.    A strong desire for the primary and/or secondary sex characteristics of the other gender.

4.    A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B. The condition is associated with clinically significant distress or impairment in social, occupational or other important areas of functioning.

18.     Adults who manifest a severe degree of the disorder are commonly referred to as "transsexuals." Without treatment, individuals with gender dysphoria experience anxiety, depression, suicidality and other attendant mental health issues. (*See, e.g.*, Fraser, 2009; Schaefer & Wheeler, 2004; Ettner, 1999; Brown, 2000, DSM-V (2013)). They are also frequently socially isolated because they carry a burden of shame and low self-esteem, attributable to the feeling of being inherently "defective." This leads to stigmatization that over time proves ravaging to healthy personality development and interpersonal relationships. As a result, without treatment, many are unable to function effectively in occupational, social, or other important areas of daily living.  A recent survey shows a 41% rate of suicide attempts among transgender people, far above the baseline rates for North America. (Haas, *et al.*, 2014).

19.     Male-to-female transsexuals without access to appropriate care, particularly those who are imprisoned, are often so desperate for relief that they resort to life-threatening attempts at auto-castration—the removal of one's testicles—in the hopes of eliminating the major source of testosterone that kindles the distress. (Brown, 2010; Brown & McDuffie, 2009).

20.     Gender dysphoria intensifies with age. Middle-aged and elderly gender dysphoric adults experience an exacerbation of symptoms.  (Ettner, 2013; Ettner & Wiley, 2013).

## IV.     TREATMENT OF GENDER DYSPHORIA

### A.     WPATH Standards of Care

21.     The standards of care for treating gender dysphoria are set forth in the World Professional Association for Transgender Health's Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (WPATH Standards of Care). The WPATH Standards of Care are recognized as authoritative by the American Medical Association, the American Psychiatric Association, and the American Psychological Association. (*See*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5                 DECLARATION OF DR. RANDI ETTNER

American Medical Association (2008), Resolution 122 (A-08); American Psychiatric Association-DSM-V; American Psychological Association Policy Statement on Transgender, Gender Identity, and Gender Expression Non-discrimination (2009)).

22.     The Standards of Care identify the following treatment protocols for treating individuals with gender dysphoria:

- Changes in gender expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity);
- Psychotherapy (individual, couple, family, or group) for purposes such as exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support; improving body image; or promoting resilience;
- Hormone therapy to feminize or masculinize the body; and
- Surgery to change primary and/or secondary sex characteristics (*e.g.*, breasts/ chest, external and/or internal genitalia, facial features, body contouring).

23.     Once a diagnosis of gender dysphoria is made, a treatment plan should be developed based on an individualized assessment of the medical needs of the particular patient.

24.     The development of any treatment plan and all subsequent treatment must be administered by clinicians qualified in treating patients with gender dysphoria.

25.     The WPATH Standards of Care specify the qualifications that professionals must meet in order to provide care to gender dysphoric patients. (*See* Section VIII). In particular, the WPATH Standards of Care provide that a mental health professional must have "Knowledge about gender-nonconforming identities and expressions, and the assessment and treatment of gender dysphoria" and obtain continuing education in the assessment and treatment of gender dysphoria. Importantly, the WPATH Standards of Care require that "[m]ental health professionals who are new to the field (irrespective of their level of training and other experience) should work under the supervision of a mental health professional with established competence in the assessment and treatment of gender dysphoria."

26.     In addition to these minimum credentials, clinicians working with gender dysphoric patients should develop and maintain cultural competence to provide optimal care. A

1    growing body of scientific literature underlies this specialized area of medicine and presents

2    advances in treatment that inform care.

3         27.    To develop competence in the assessment and treatment of gender dysphoria,

4    clinicians should work under the supervision of mental health professionals with established

5    expertise in this area and pursue self-study. Self-study, however, cannot substitute for first-hand

6    clinical experience in treating the range of clinical presentations of gender dysphoria, or the

7    mentorship and supervision of an expert in this field.

8         28.    Treatment plans generated by providers lacking the requisite experience can result

9    in inappropriate care, or place patients at significant medical risk.

10        29.    Like protocols for the treatment of diabetes or other medical disorders, medical

11   management of gender dysphoria for incarcerated individuals does not differ from protocols for

12   non-institutionalized persons. For this reason, the WPATH Standards of Care expressly state that

13   all elements of the prescribed assessment and treatment are equally applicable to patients in

14   prison (Section XIV) and the National Commission on Correctional Health Care (NCCHC)

15   recommends treatment in accordance with the WPATH Standards of Care for people in

16   correctional settings.  (NCCHC Position Statement, Transgender, Transsexual, and Gender Non-

17   Conforming Health Care in Correctional Settings (October 18, 2009, reaffirmed with revisions

18   April 2015), http://www.ncchc.org/transgender-transsexual-and-gender-nonconforming-health-

19   care).

20        30.    Psychotherapy or counseling can provide support and help with the many issues

21   that arise in tandem with gender dysphoria. Counseling alone, however, is not a substitute for

22   medical intervention where medical intervention is needed, nor is it a precondition for such

23   intervention. By analogy, in Type One diabetes, counseling might provide psychoeducation about

24   living with a chronic condition, and information about nutrition, but it does not obviate the need

25   for insulin.  *Not a good analogy*

26        31.    For many individuals with gender dysphoria, changes to gender expression and

27   role to feminize or masculinize one's appearance, often called the "real life experience," are an

28   important part of treatment for the condition. This involves dressing, grooming and otherwise

1   outwardly presenting oneself through social signifiers of gender consistent with one's gender

2   identity. This is an appropriate and necessary part of identity consolidation. Through this

3   experience, the shame of growing up living as a "false self" and the grief of being born into the

4   "wrong body" can be ameliorated.  (Greenberg and Laurence, 1981; Ettner, 1999; Devor, 2004;

5   Bockting, 2007).

6          **B.     Hormone Therapy**

7          32.     For individuals with persistent, well-documented gender dysphoria, hormone

8   therapy is an essential and medically indicated treatment to alleviate the distress of the condition.

9   Hormone therapy is a well-established and effective means of treating gender dysphoria. The

10  American Medical Association, the Endocrine Society, the American Psychiatric Association and

11  the American Psychological Association all agree that hormone therapy in accordance with the

12  WPATH Standards of Care is medically necessary treatment for many individuals with gender

13  dysphoria. (*See* American Medical Association (2008), Resolution 122 (A-08); Endocrine

14  Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline (2009);

15  American Psychological Association Policy Statement on Transgender, Gender Identity and

16  Gender Expression Nondiscrimination (2009)).  Similarly, the NCCHC recognizes that hormone

17  therapy should be provided to transgender inmates when determined to be medically necessary as

18  a treatment for their gender dysphoria.  (NCCHC Position Statement, Transgender, Transsexual,

19  and Gender Non-Conforming Health Care in Correctional Settings (April 2015)).

20         33.     The goals of hormone therapy for individuals with gender dysphoria are (i) to

21  significantly reduce hormone production associated with the person's birth sex and, thereby, the

22  secondary sex characteristics of the individual's birth sex and (ii) to replace circulating sex

23  hormones associated with the person's birth sex with feminizing or masculinizing hormones,

24  using the principles of hormone replacement treatment developed for hypogonadal patients (*i.e.*,

25  males born with insufficient testosterone or females born with insufficient estrogen). (*See*

26  Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline

27  (2009)).

28

34.     The therapeutic effects of hormone therapy are twofold: (i) with endocrine treatment, the patient acquires congruent sex characteristics, *i.e.* for transgender women, breast development, redistribution of body fat, cessation of male pattern baldness, and reduction of body hair; and (ii) hormones act directly on the brain, via receptors sites for sex steroids, which produces an attenuation of dysphoria and attendant psychiatric symptoms, and the promotion of a sense of well-being. (*See, e.g.*, Cohen-Kettenis & Gooren, 1992).

35.     The efficacy of hormone therapy to treat gender dysphoria is observed clinically and well documented in the literature. For example, in one study, researchers investigated 187 transsexual patients who had received hormones and compared them with a group who did not. Untreated patients showed much higher levels of depression, anxiety, and social distress. (Rametti, *et al.*, 2011; *see also* Colizzi, *et al.* 2014; Gorin-Lazard, *et al.*, 2011).

36.     Some individuals with gender dysphoria experience profound relief from hormone therapy alone such that further treatment, such as surgical intervention, is not required. (WPATH Standards of Care, 2013).

C.     **Sex Reassignment Surgery**

37.     For many individuals with severe gender dysphoria, however, hormone therapy and psychotherapy alone is insufficient. Relief from their dysphoria cannot be achieved without surgical intervention to modify primary sex characteristics, *i.e.*, genital reconstruction.

38.     Genital reconstruction surgery for male-to-female transsexuals has two therapeutic purposes: First, removal of the testicles eliminates the major source of testosterone in the body. Second, the patient attains body congruence resulting from the normal appearing and functioning female uro-genital structures. Both are critical in alleviating or eliminating gender dysphoria.

39.     Decades of careful and methodologically sound scientific research have demonstrated that sex reassignment surgery is a safe and effective treatment for severe gender dysphoria and, indeed, for many people, it is the only effective treatment. (*See, e.g.*, Pfafflin & Junge, 1998; Smith, *et al.*, 2005; Jarolim, *et al.*, 2009).

40.     WPATH , the American Medical Association, the Endocrine Society, and the American Psychological Association all support surgery in accordance with the WPATH

1    Standards of Care as medically necessary treatment for individuals with severe gender dysphoria.

2    (*See* American Medical Association (2008), Resolution 122 (A-08); Endocrine Treatment of

3    Transsexual Persons: An Endocrine Society Clinical Practice Guideline (2009) ("For many

4    transsexual adults, genital sex reassignment surgery may be the necessary step towards achieving

5    their ultimate goal of living successfully in their desired gender role."); American Psychological

6    Association Policy Statement on Transgender, Gender Identity and Gender Expression

7    Nondiscrimination (2009) (recognizing "the efficacy, benefit and medical necessity of gender

8    transition treatments" and referencing studies demonstrating the effectiveness of sex-

9    reassignment surgeries)). In addition, the NCCHC recognizes that "[s]ex reassignment surgery

10   should be considered on a case-by-case basis and provided when determined to be medically

11   necessary" for incarcerated patients. (NCCHC Position Statement, Transgender, Transsexual, and

12   Gender Non-Conforming Health Care in Correctional Settings (April 2015)).

13       41.    Surgeries are considered "effective" from a medical perspective if they "have a

14   therapeutic effect" (Monstrey, *et al.*, 2007).  More than three decades of research confirms that

15   sex reassignment surgery is therapeutic and therefore an effective treatment for gender dysphoria.

16   Indeed, for many patients with severe gender dysphoria, sex reassignment surgery is the *only*

17   effective treatment.

18       42.    In a 1998 meta-analysis, Pfafflin and Junge reviewed data from 80 studies,

19   spanning 30 years, from 12 countries. They concluded that "reassignment procedures were

20   effective in relieving gender dysphoria. There were few negative consequences and all aspects of

21   the reassignment process contributed to overwhelmingly positive outcomes" (Pfafflin & Junge,

22   1998).

23       43.    Numerous subsequent studies confirm this conclusion. Researchers reporting on a

24   large-scale prospective study of 325 individuals in the Netherlands concluded that after surgery

25   there was "a virtual absence of gender dysphoria" in the cohort and "results substantiate previous

26   conclusions that sex reassignment is effective" (Smith, *et al.*, 2005). Indeed, the authors of the

27   study concluded that the surgery "appeared therapeutic and beneficial" across a wide spectrum of

28

1     factors and "[t]he main symptom for which the patients had requested treatment, gender

2     dysphoria, had decreased to such a degree that it had disappeared."

3         44.     In 2007, Gijs and Brewayes analyzed 18 studies published between 1990 and

4     2007, encompassing 807 patients. The researchers concluded: "Summarizing the results from the

5     18 outcome studies of the last two decades, the conclusion that [sex reassignment surgery] is the

6     most appropriate treatment to alleviate the suffering of extremely gender dysphoric individuals

7     still stands: Ninety-six percent of the persons who underwent [surgery] were satisfied and regret

8     was rare."

9         45.     Studies conducted in countries throughout the world conclude that surgery is an

10     extremely effective treatment for gender dysphoria. For example, a 2001 study published in

11     Sweden states: "The vast majority of studies addressing outcome have provided convincing

12     evidence for the benefit of sex reassignment surgery in carefully selected cases" (Landen, 2001).

13     Similarly, urologists at the University Hospital in Prague, Czech Republic, in a Journal of Sexual

14     Medicine article concluded: "Surgical conversion of the genitalia is a safe and important phase of

15     the treatment of male-to-female transsexuals" (Jarolim, 2009).

16         46.     Patient satisfaction is an important measure of effective treatment. Achieving

17     functional and normal physical appearance consistent with gender identity alleviates the suffering

18     of gender dysphoria and enables the patient to function in everyday life. Studies have shown that

19     by alleviating the suffering and dysfunction caused by severe gender dysphoria, sex reassignment

20     surgery improves virtually every facet of a patient's life. This includes satisfaction with

21     interpersonal relationships and improved social functioning. ((Rehman, *et al.*, 1999; Johansson, *et*

22     *al.*, 2010; Hepp, *et al,.* 2002; Ainsworth & Spiegel, 2010; Smith, *et al.*, 2005); improvement in

23     self-image and satisfaction with body and physical appearance (Lawrence, 2003; Smith, *et al.*,

24     2005; Weyers, *et al.*, 2009); and greater acceptance and integration into the family (Lobato, *et al.*,

25     2006)).

26         47.     Studies have also shown that surgery improves patients' abilities to initiate and

27     maintain intimate relationships (Lobato, *et al.*, 2006; Lawrence, 2005; Lawrence, 2006; Imbimbo,

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11        DECLARATION OF DR. RANDI ETTNER

1    *et al.,* 2009; Klein & Gorzalka, 2009; Jarolim, *et al.,* 2009; Smith, *et al.,* 2005; Rehman, *et al.,*

2    1999; DeCuypere, *et al.,* 2005).

3         48.    Multiple long term studies have confirmed these results. (*See, e.g.,*

4    "Transsexualism in Serbia: a twenty-year follow-up study" (Vujovic, *et al.,* 2009); "Long-term

5    assessment of the physical, mental, and sexual health among transsexual women" (Weyers,

6    2009); "Treatment follow-up of transsexual patients" (Hepp, *et al.,* 2002); "A five-year follow-up

7    study of Swedish adults with gender identity disorder" (Johansson, *et al.,* 2010); "A report from a

8    single institute's 14 year experience in treatment of male- to-female transsexuals" (Imbimbo, *et*

9    *al.,* 2009); 'Followup of sex reassignment surgery in transsexuals: a Brazilian cohort" (Lobato, *et*

10   *al.,* 2006)).

11        49.    Given the extensive experience and research supporting the effectiveness of sex

12   reassignment surgery spanning decades, it is clear that sex reassignment surgery is a medically

13   necessary, not experimental, treatment for gender dysphoria as demonstrated by its recognition by

14   various medical organizations as a medically necessary treatment for gender dysphoria.

15        50.    In 2008, WPATH issued a "Medical Necessity Statement" expressly stating:

16   "These medical procedures and treatment protocols are not experimental:  decades of both clinical

17   and medical research show they are essential to achieving well-being for the transsexual patient."

18        51.    Similarly, Resolution 122 (A-08) of the American Medical Association states:

19   "Health experts in GID, including WPATH, have rejected the myth that these treatments are

20   'cosmetic' or 'experimental' and have recognized that these treatments can provide safe and

21   effective treatment for a serious health condition."

22        52.    On September 25, 2013 the Department of Health Care Services of the State of

23   California Health and Human Services Agency issues All Plan Letter 13-011, which makes clear

24   that gender reassignment surgery is a covered service for Medi-Cal beneficiaries and referred

25   providers to the WPATH Standards of Care for the "criteria for the medical necessity of

26   transgender services."

27        53.    On May 30, 2014, the Appellate Division of the Departmental Appeals Board of

28   the United States Department of Health and Human Services issued decision number 2576, in

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
                                    12          DECLARATION OF DR. RANDI ETTNER

1 which the Board determined that a Medicare regulation denying coverage of "all transsexual

2 surgery as a treatment for transsexualism" was not valid under the "reasonableness standard."

3 The Board specifically concluded that "transsexual surgery is an effective treatment option for

4 transsexualism in appropriate cases."

5 **V.    EVALUATION AND RECOMMENDATION REGARDING MS. QUINE**

6     **A.    Relevant Background History**





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**B.**    <u>Mental Status Examination</u>

15                          DECLARATION OF DR. RANDI ETTNER



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16                    DECLARATION OF DR. RANDI ETTNER

C.   **Gender Dysphoria**

72.     A review of records reveals that beginning at least by 2008, Ms. Quine has

consistently been diagnosed with gender dysphoria (or gender identity disorder).

73.     She has been treated with hormone therapy since 2009.  As a result of long-term

hormonal usage, she is now *hormonally reassigned*. That is to say, she has female secondary sex

characteristics and sex steroid levels corresponding to an adult female—*i.e.*, increased size of

areolae with breast tissue expansion, a redistribution of body fat in the hips and buttocks in an

estrogen-distribution pattern, diminished size and volume of the testes, reduction in prostate size,

and hormone levels that match that of an adult female. She has changed the social aspects of

gender expression, which is often more challenging than changing physical characteristics,

particularly in a prison setting.

74.     Ms. Quine has engaged in counseling, and has successfully consolidated her

female identity. She has attempted to change her given name legally, and has relentlessly

advocated for medical and surgical care, but her requests were denied by CDCR.

75.     Ms. Quine's intractable determination to live authentically and reduce the

dysphoria, was the impetus to permanently tattoo facial make-up, as cosmetics are contraband.

She has demonstrated resilience in her "real life experience", enduring harassment by staff and

inmates, who refer to her as "dude" and make "puking" sounds in her presence. A barrage of

research documents that stigma and humiliation combine with the unremitting pain of gender and

anatomical incongruence, producing serious and enduring deterioration of mental and physical

1    health. (Jones, *et al*, 1984; Meyer, 2003; Nuttbrock, Hwang & Bockting, 2010; Nuttbrock, *et al*,

2    2013; Reisner, *et al*, 2014; Singh, Hays & Watson, 2011). In a context of discrimination, stigma

3    correlates not only with depression, but with physical health problems, such as hypertension and

4    cardioreactivity. (Ettner, White & Ettner, 2012).

5        76.    Despite years of feminizing hormone therapy, Ms. Quine continues to suffer from

6    gender dysphoria and attendant depression. Ms. Quine's dysphoria regarding her male genitalia

7    has intensified with long-term hormonal treatment. Having a female appearance and male

8    genitalia is the source of profound distress. Her inability to reduce or modulate this internal

9    anguish is likely to result in emotional decompensation and further self-harm.

10       77.    Clearly, after years of counseling and hormone therapy, Ms. Quine now requires

11   genital surgery. *i.e.,* the reconstruction of primary sex characteristics. Were Ms. Quine to undergo

12   this surgical procedure, her symptoms would be attenuated and possibly eliminated.

13   **D.**    **Recommended Treatment**

14       78.    The WPATH Standards of Care establish the following requirements for a patient

15   seeking sex reassignment surgery:

16       1.   Persistent, well-documented gender dysphoria.

17       2.   Capacity to make a fully-informed decision and to consent for treatment.

18       3.   Age of majority in a given country;

19       4.   If significant medical or mental health concerns are present, they must be well
        controlled.

20   
21       5.   12 months of hormone therapy as appropriate to the patient's gender goals
        (unless hormones are not clinically indicated for the individual).

22       6.   12 continuous months of living in an identity-congruent gender role.

23       79.    Ms. Quine meets, and exceeds, the criteria for surgery: She has persistent, well-

24   documented gender dysphoria. She is free of any disorders of thought or impaired reality testing,

25   able to provide informed consent and to participate in decisions regarding her healthcare. She

26   understands the irrevocable nature of surgery and the potential for complications. Having been on

27   hormonal therapy for six years, irreversible anatomical changes have already eventuated. (*See,*

28   *e.g.,* Gooren & Delemarre-van de Waal, 2007; Fisher & Maggi, 2015). Since 2008, Ms. Quine has

1  consistently lived in her affirmed and well-consolidated female gender. She has no mental health

2  or medical concerns that contraindicate surgery. On the contrary, surgery is the therapeutic

3  intervention that would significantly improve her emotional and physical health.

4     80.   Owing to the severity of her gender dysphoria, the ensuing clinically significant

5  distress, and the limited efficacy of hormone therapy, reassignment surgery is medically

6  necessary for Ms. Quine, and should be implemented as soon as practical. Surgery would create

7  congruent genitalia, thereby eliminating the severe distress Ms. Quine experiences as a result of

8  having male genitalia but a female body and identity. Moreover, removal of the target organ

9  (testes) eliminates 80% of androgen production and involves an entirely different

10  pathophysiology than a medical suppressive regimen. (Kirk, 1999). Therefore, her entire

11  hormonal protocol would be minimized (low-dose estrogen is still required to maintain bone

12  density), conferring considerable health benefits, particularly therapeutic, given her history of

13  hepatitis C.

14     81.   Gender dysphoria intensifies with age. Ms. Quine currently denies suicidal

15  ideation as she is optimistic that she will receive surgery as a result of this lawsuit. Without

16  surgery, Ms. Quine will succumb to feelings of hopelessness and despair and will be at great risk

17  for emotional destabilization and suicide. This risk is particularly severe given her prior suicide

18  attempts.

19     82.   There are no contraindications to the implementation of medically necessary

20  surgical intervention for this inmate. The potential consequences of denying appropriate treatment

21  however, are predictable and dire.

22     I declare under penalty of perjury that the foregoing is true and correct.

26  Dated: July 23, 2015          Randi C. Ettner, PhD

19   DECLARATION OF DR. RANDI ETTNER

# ATTACHMENT B

1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                                 SAN FRANCISCO DIVISION

11

| | |
|---|---|
| **SHILOH HEAVENLY QUINE,** | C 14-02726 JST |
| Plaintiffs, | **DECLARATION OF RICHARD A. CARROLL, Ph.D.** |
| **v.** | Judge:        The Honorable Jon S. Tigar |
| **BEARD, et al.,** | Trial Date:    January 4, 2016 |
| Defendants. | Action Filed:  June 12, 2014 |

19      I, Richard A. Carroll, Ph.D., declare:

20      1.      I am an Associate Professor in the Department of Psychiatry and Behavioral Sciences

21  and Director of the Sexual Disorders & Couple Therapy Program at Northwestern University

22  Feinberg School of Medicine.  I am a reviewer for the Journal of Sex and Marital Therapy and the

23  Journal of Sexual Medicine.  I am a past President of the Society for Sex Therapy and Research.

24  I have published three articles related to gender dysphoria and have treated hundreds of patients

25  diagnosed with gender dysphoria over the past 30 years.  I received my Ph.D. in clinical

26  psychology from the University of Pittsburgh in 1985.

27

28

1

1       2.    In June 2015, the California Department of Corrections and Rehabilitation (CDCR)

2  retained me to render an opinion as to whether sex-reassignment surgery was medically necessary

3  for CDCR inmate Shiloh Quine.

4       3.    In preparation for my assessment, I was provided with the definition of "medically

5  necessary" procedures set forth in California Code of Regulations, title 15, section 3350.  Under

6  that regulation, "medically necessary" is defined as health care services that are determined by the

7  attending physician to be reasonable and necessary to protect life, prevent significant illness or

8  disability, or alleviate severe pain, and are supported by health outcome data as being effective

9  medical care.  "Severe pain" is defined as a degree of discomfort that significantly disables the

10  patient from reasonable independent function.  And "significant illness" and "disability" are

11  defined as any medical condition that causes or may cause if left untreated a severe limitation of

12  function or ability to perform the daily activities of life or that may cause premature death.

13       4.    Before examining Ms. Quine, I reviewed all of her CDCR medical and mental-health

14  records.

15       5.    On June 19, 2015, I personally interviewed Ms. Quine at Mule Creek State Prison for

16  approximately three hours and performed various psychological tests during that time.  I found

17  Ms. Quine to be cooperative, focused, and responsive to my questioning and testing.

18       6.    Ms. Quine's personal history and mental-health factors are consistent with a typical

19  presentation of male-to-female gender dysphoria.  Ms. Quine has a long history of cross-dressing

20  and persistent feelings of being a woman most of her life, including in her relationships with men.

21  It is unsurprising that Ms. Quine kept her fantasies of being a woman hidden until 2009, given her

22  dysfunctional childhood, feelings of shame and lack of exposure to the concept of gender

23  dysphoria.  She meets the criteria for the diagnosis of Gender Dysphoria as defined by the Fifth

24  Edition of the Diagnostic and Statistical Manual of the American Psychiatric Association.

25       7.    Ms. Quine also has a history of anxiety disorder and depressive disorder.  She has

26  attempted suicide on multiple occasions and reports one instance of attempted self-castration.

27  Ms. Quine's gender dysphoria is a separate diagnosis from her depressive disorder.  Ms. Quine

28  suffers significant anxiety and depression as a direct result of her gender dysphoria.

2

8.      In 2009, CDCR psychologists diagnosed Ms. Quine with Gender Identity Disorder (now identified as Gender Dysphoria).  Since that time, Ms. Quine has been receiving feminizing hormone treatment and has been living as a woman.

9.      Based on my examination of Ms. Quine's medical and mental health records and my clinical interview, I have determined that genital sex-reassignment surgery is appropriate and medically necessary treatment for Ms. Quine.  Sex-reassignment surgery is medically necessary to prevent Ms. Quine from suffering significant illness or disability, and to alleviate severe pain caused by her gender dysphoria.  In addition, sex-reassignment surgery is likely to significantly reduce Ms. Quine's other mental-health conditions, which include depression, anxiety, and risk of suicide attempts.

I declare under penalty of perjury that the foregoing is true.  Executed August 6, 2015, in Chicago, Illinois.

RICHARD A. CARROLL, PH.D.

3



US POSTAGE PITNEY BOWES

ZIP 92706
02 1W
0001382531 NOV 12 2015
$ 005.95⁰

FIRST CLASS



CN COM

From

**FARIDA BAIG**
632 E. CARSON STREET, #2
LONG BEACH, CA 90807

To

United States District Court
CIVIL INTAKE
312 North Spring Street
Los Angeles, CA 90012



NOV 18 2015

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CA

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff    Los Angeles
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Los Angeles
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Farida Baig, in pro per

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

❏ 1   U.S. Government
     Plaintiff

❏ 3   Federal Question
     *(U.S. Government Not a Party)*

☒ 2   U.S. Government
     Defendant

❏ 4   Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*      *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ☒ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - | ❏ 690 Other | ❏ 423 Withdrawal | ❏ 400 State Reapportionment |
| ❏ 130 Miller Act | ❏ 315 Airplane Product |    Product Liability | |    28 USC 157 | ❏ 410 Antitrust |
| ❏ 140 Negotiable Instrument |    Liability | ❏ 367 Health Care/ | | | ❏ 430 Banks and Banking |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel & |    Pharmaceutical | | **PROPERTY RIGHTS** | ❏ 450 Commerce |
|    & Enforcement of Judgment |    Slander |    Personal Injury | | ❏ 820 Copyrights | ❏ 460 Deportation |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' |    Product Liability | | ❏ 830 Patent | ❏ 470 Racketeer Influenced and |
| ❏ 152 Recovery of Defaulted |    Liability | ❏ 368 Asbestos Personal | | ❏ 840 Trademark |    Corrupt Organizations |
|    Student Loans | ❏ 340 Marine |    Injury Product | | | ❏ 480 Consumer Credit |
|    (Excludes Veterans) | ❏ 345 Marine Product |    Liability | **LABOR** | **SOCIAL SECURITY** | ❏ 490 Cable/Sat TV |
| ❏ 153 Recovery of Overpayment |    Liability | **PERSONAL PROPERTY** | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | ❏ 850 Securities/Commodities/ |
|    of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud |    Act | ❏ 862 Black Lung (923) |    Exchange |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle | ❏ 371 Truth in Lending | ❏ 720 Labor/Management | ❏ 863 DIWC/DIWW (405(g)) | ❏ 890 Other Statutory Actions |
| ❏ 190 Other Contract |    Product Liability | ❏ 380 Other Personal |    Relations | ❏ 864 SSID Title XVI | ❏ 891 Agricultural Acts |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal |    Property Damage | ❏ 740 Railway Labor Act | ❏ 865 RSI (405(g)) | ❏ 893 Environmental Matters |
| ❏ 196 Franchise |    Injury | ❏ 385 Property Damage | ❏ 751 Family and Medical | | ❏ 895 Freedom of Information |
| | ❏ 362 Personal Injury - |    Product Liability |    Leave Act | |    Act |
| |    Medical Malpractice | | ❏ 790 Other Labor Litigation | | ❏ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 791 Employee Retirement | **FEDERAL TAX SUITS** | ❏ 899 Administrative Procedure |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** |    Income Security Act | ❏ 870 Taxes (U.S. Plaintiff |    Act/Review or Appeal of |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | |    or Defendant) |    Agency Decision |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate | | ❏ 871 IRS—Third Party | ☒ 950 Constitutionality of |
| ❏ 240 Torts to Land | ❏ 443 Housing/ |    Sentence | |    26 USC 7609 |    State Statutes |
| ❏ 245 Tort Product Liability |    Accommodations | ❏ 530 General | | | |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - | ❏ 535 Death Penalty | **IMMIGRATION** | | |
| |    Employment | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 446 Amer. w/Disabilities - | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration | | |
| |    Other | ❏ 550 Civil Rights |    Actions | | |
| | ❏ 448 Education | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - | | | |
| | |    Conditions of | | | |
| | |    Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
     Proceeding

❏ 2   Removed from
     State Court

❏ 3   Remanded from
     Appellate Court

❏ 4   Reinstated or
     Reopened

❏ 5   Transferred from
     Another District
     *(specify)*

❏ 6   Multidistrict
     Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Constitution, Article VI, Section 10

Brief description of cause:
COMPLAINT FOR DECLARATORY RELIEF AND INJUNCTIVE RELIEF

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION
   UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ❏ Yes   ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE                       DOCKET NUMBER

DATE
10/22/2015

SIGNATURE OF ~~ATTORNEY OF RECORD~~ Plaintiff in pro per

### FOR OFFICE USE ONLY

RECEIPT #       AMOUNT       APPLYING IFP       JUDGE       MAG. JUDGE

# CV15-08963

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the six boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.